2025-1559

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

---

**KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET, A.S.,**
Plaintiff-Appellant

**ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S.,**
Plaintiff-Intervenor

**v.**

**UNITED STATES,**
Defendant-Appellee

**REBAR TRADE ACTION COALITION,**
Defendant-Intervenor

---

Appeal from the United States Court of International Trade in
No. 1:24-cv-00018-JAR, Judge Jane Ann Restani

---

## OPENING BRIEF FOR PLAINTIFF-APPELLANT
## KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET, A.S.

Daniel L. Delnero
Allen W. Yee
**BGD Legal & Consulting, LLC**

Dated: May 19, 2025

*Counsel for Plaintiff-Appellant Kaptan
Demir Celik Endustrisi ve Ticaret, A.S.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2025-1559 |
| **Short Case Caption** | Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. US |
| **Filing Party/Entity** | Kaptan Demir Celik Endustrisi ve Ticaret A.S. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/01/2025

Signature: /s/ Daniel L. Delnero

Name: Daniel L. Delnero

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Kaptan Demir Ce1ik Endustrisi ve Ticaret A.S | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable          ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)   ☑ No   ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

**CONFIDENTIAL MATERIAL DELETED FROM THE
NONCONFIDENTIAL BRIEF**


This Brief contains <u>no</u> Business Proprietary Information (BPI). Any BPI contained in brackets on pages of the Appendices have been redacted. Any business proprietary information is subject to the protective order in the administrative proceeding before the U.S. Department of Commerce, the U.S. Court of International Trade, and Federal Circuit Rule 28(d). The material redacted includes business proprietary information submitted before the U.S. Department of Commerce and the U.S. Court of International Trade, detailing the Plaintiff-Appellee's financial status as well as other financial, business, and industry information.


Dated: May 19, 2025

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION                                                  1

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW                                1

STATEMENT OF THE CASE                                                      2

ARGUMENT                                                                  10

I.     STANDARD OF REVIEW                                                 10

II.    THE CIT ERRED IN DISREGARDING THE CONTRACT DATE.                   11

   i.    Kaptan and the US Buyer Entered into a Binding Contract that Reflects a
         Meeting of the Minds on Material Terms.                          12

   ii.   The CIT Erred in Disregarding the Contract Date Based on The Parties'
         Ability to Later Modify It Via Mutual Agreement.                 13

   iii.  Nothing In the Record Suggests That the Size Breakdown Was Added After
         the Contract Was Signed.                                        16

III.   THE CIT IMPROPERLY DEFERRED TO COMMERCE DEPARTMENT
       REGULATIONS AND INTERPRETATIVE GUIDANCE.                           16

   i.    The Agency-Created Invoice Date Presumption Does Not Survive Loper.  18

   ii.   Absent Chevron-style Deference, the Invoice Date Presumption Cannot
         Stand.                                                          19

CONCLUSION                                                               22

ADDENDUM OF REQUIRED DOCUMENTS                                            5

## TABLE OF AUTHORITIES

CASES

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156, 168 (1962) .............................................................10

*Chevron, U.S.A., Inc. v. N.R.D.C., Inc.*,
  467 U.S. 837, 842 (1984) ................................................. 11, 18-20

*Diaz v. United States,*
  156 Fed. Cl. 270, 278 (2021) ......................................................15

*Downhole Pipe & Equip., L.P. v. United States*,
  776 F.3d 1369, 1373 (Fed. Cir. 2015) .........................................10

*Eregli Demir ve Celik Fabrikalari T.A.S. v. United States,*
  308 F. Supp. 3d 1297, 1306 (CIT 2018)......................................17

*Gallant Ocean (Thailand) Co. v. United States*,
  602 F.3d 1319, 1323 (Fed. Cir. 2010) .........................................10

*Harris v. United States,*
  595 F. App'x 993, 994 (Fed. Cir. 2015) .................................17, 20

*Hyundai Elecs. Indus. Co. v. United States*,
  899 F.2d 1204, 1209 (Fed. Cir. 1990) .........................................11

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369, 373, 397, 408-09, 412-13 (2024) ....................... 2, 9-11, 18-21

*MDNet, Inc. v. Pharmacia Corp.,*
  147 F. App'x 239, 243 (3d Cir. 2005) .........................................14

*NLRB v. Columbian Enameling & Stamping Co.*,
   306 U.S. 292, 300 (1939)............................................................10

*South Hampton Co. v. Stinnes Corp.,*
  733 F.2d 1108, 1117-18 (5th Cir. 1984) .....................................14

*Towers Charter & Marine Corp. v. Cadillac Ins. Co.,*
    894 F.2d 516, 522 (2d Cir. 1990) .................................................14

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474, 477 (1951) ...........................................................10

<u>S</u><u>TATUTES</u>

28 U.S.C. § 1292(a)(1) ........................................................................9

28 U.S.C. § 1581(c) .............................................................................9

19 C.F.R. § 351.401(i) .......................................................................12

5 U.S.C. § 706(2)(A) .........................................................................14

19 U.S.C. § 1516a(b)(1)(B)(i) ...........................................................10

19 U.S.C. § 1673. ...............................................................................20

19 U.S.C. § 1677b(a)(1)(A) ...............................................................20

<u>A</u><u>DMINISTRATIVE</u> <u>D</u><u>ETERMINATIONS</u> & <u>P</u><u>UBLICATIONS</u>

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*: *Final IDM*
    at 13-21, 88 Fed. Reg. 89663 ............................................................12

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States,*
    Slip Op 25-4 (Ct. Int'l Trade January 15, 2025, J. Restani)...........9

*See Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
    87 Fed. Reg. 54463, 54473 (Dep't of Commerce Sept. 6, 2022).................10

**STATEMENT OF RELATED CASES**

Pursuant to Rule 47.5 of the Rules of the United States Court of Appeals for the Federal Circuit, counsel for Plaintiff-Appellant Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan") is unaware of any other cases appealing the same civil action or proceeding and is unaware of any other cases that will directly affect or be directly affected by this Court's decision.

**STATEMENT OF JURISDICTION**

Pursuant to Rule 28(a)(4) of the Rules of the United States Court of Appeals for the Federal Circuit, counsel for Plaintiff-Appellant Kaptan states this Court's jurisdiction rests upon the following bases: (a) The United States Court of International Trade ("CIT") possessed jurisdiction pursuant to 28 U.S.C. § 1581(c); (b). The statutory basis for this Court's jurisdiction on appeal is 28 U.S.C. § 1292(a)(1); (c) The CIT entered its judgment on January 15, 2025. Pursuant to Rule 4(a)(1)(B)(ii) of the Federal Rules of Appellate Procedure, this appeal was filed timely on March 14, 2025.

**STATEMENT OF THE ISSUE PRESENTED FOR REVIEW**

This appeal raises the following issue: Whether the CIT erred in (a) finding substantial evidence supported the date of sale determination by the Department of

Commerce ("Commerce") and (b) deferring to Commerce's agency-created rebuttable presumption that the invoice date is the date of sale rather than undertaking an independent analysis as required under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

## STATEMENT OF THE CASE

### I. NATURE OF THE CASE

This is an appeal of the CIT final decision of *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, Slip Op 25-4 (Ct. Int'l Trade January 15, 2025, J. Restani) Appx1-25. There, the CIT sustained Commerce's date of sale determination, its differences in merchandise ("DIFMER") calculation (which is not presented for review on appeal here), and the resulting dumping rate of 25.86 in its Final Results.

### II. STATEMENT OF THE FACTS

Plaintiff-Appellant Kaptan is a producer of steel concrete reinforcing bar (commonly called "rebar") in the Republic of Turkey ("Turkey"). On July 14, 2017, Commerce published in the Federal Register the Antidumping Order on rebar from Turkey. Antidumping Order, 82. Fed. Reg. 32532, Appx25. On September 6, 2022, Commerce published the initiation notice for the 2021–2022 Administrative Review of the Antidumping Order for Rebar from Turkey. *See Initiation of Antidumping and*

*Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 54463, 54473 (Dep't of Commerce Sept. 6, 2022) Appx36.

During this period of review, Turkey experienced hyper-inflation of greater than 25%. *See* Letter from Colakoglu & Kaptan to U.S. Dep't of Commerce, re: Notice of Inflation Rate Above 25 Percent at 1, Attachment 1 (Oct. 21, 2022) Appx78-85; *see also Steel Concrete Reinforcing Bar from the Republic of Turkey: Preliminary Results of Antidumping Duty Administrative Review and Decision Memorandum; 2021-2022,* 88 Fed. Reg. 50100, 50101 (Dep't of Commerce Aug. 1, 2023) ("*Preliminary AD Results*"), Appx235-237; and accompanying Preliminary Decision Memorandum ("PDM"), Appx227-233.

The exchange rate between USD and Turkish currently was changing rapidly due to hyper-inflation. Less than two months after negotiating and signing the contract, the first sale was made. In more stable economic environments, such a short period of time would not create a material difference in the price of goods imported. But Kaptan was enduring the economic headwinds of Turkish hyper-inflation and, admirably, was still honoring the negotiated contract price to its American buyer, which certainly the buyer expected to pay based on the contract price just negotiated. *Id.*

On September 29, Commerce selected Kaptan as a mandatory respondent for individual examination. *See* Memorandum from R. Copyak to S. Thomson re:

Respondent Selection Memorandum for Administrative Review of the Antidumping Duty Order on Steel Concrete Reinforcing Bar from the Republic of Turkey; 2021-2022 at 1, (Oct. 7, 2022), Appx51. On July 27, 2022, Kaptan filed a request for administrative review. *See* Kaptan's Request for Antidumping Administrative Review (July 27, 2022), Appx29.

Kaptan fully cooperated in the administrative review. It responded to numerous questionnaires and supplemental questionnaires from Commerce. *See e.g.,* Kaptan's Response to the Department's Section A Questionnaire (Nov. 7, 2022) ("Sec. A QR"), Appx87-99; Kaptan's Response to the Department's Section B Questionnaire (Dec. 8, 2022) ("Sec. B QR"), Appx*101-153*; Kaptan's Response to the Department's Section C Questionnaire (Dec. 8, 2022) ("Sec. C QR"), Appx120-153; and Kaptan's Response to the Department's Section D High Inflation Questionnaire (Dec. 8, 2022) ("Sec. D QR"), Appx155-206; Kaptan's Response to the Department's Supplemental Sections A-C Questionnaire (June 1, 2023) ("Supp. A-C QR"), Appx174-189; Kaptan's Response to the Department's Supplemental Section D Questionnaire (June 29, 2023), Appx203-206; and Kaptan's Responses to the Department's Third and Fourth Supplemental Questionnaires (July 20, 2023) ("3rd & 4th Supp. QR"), Appx208-220.

Kaptan provided substantial evidence demonstrating that the invoice date was not the proper measure of date of sale during the period of review. Sec. C QR,

Appx120-154; Supp. A-C QR, Appx174-189; and 3rd & 4th Supp. QR, Appx208-220. Specifically, in it is initial questionnaire response, Kaptan reported that "all major terms of sale, including the price, quantity, size breakdown, and latest date of shipment, were finalized on the date of the contract and did not change between the invoice and contact date." Sec. C QR at Appx125-126. Kaptan provided a "comparison chart, which demonstrates that the material terms of Kaptan's sales are set on the contract date and are consistent with the final invoice, within permissible tolerances." *Id.* at C-20, C-6.a, Appx126, Appx145-151. Kaptan explained why material terms of sale did not change between invoice and contract date. Supp. A-C QR at 3, 26-29, Appx175-179. Kaptan provided supporting documentation showing the contracts were binding and could not be changed after the contract date except upon written amendment executed by both parties and approval by the Kaptan board. Sec. C QR at Exh. C-6.b, Appx152 (providing contracts and invoices from the period of review); Supp. A-C QR at Exhs. S1-40, S1-41, Appx182-189.

Indeed, "[t]here were no post-contract amendments or other changes to the material terms of sale after the contract date," consistent with an explicit directive from Kaptan's Board of Directors that barred changes to price and quantity terms of a contract without their approval. Supp. A-C QR at 27-29, Appx177-179.

Kaptan showed "the material terms of Kaptan's sales are set on the contract date and are consistent with the final invoice, within permissible tolerances," Sec. C

QR at C-20, C-6.a, C-6.b (Appx126, Appx145-154), and "invoiced price and overall quantity for sales under Kaptan's contracts in effect during the period of review did not change outside the permissible tolerances provided." Supp. A-C QR at 3, *Appx175*

On August 1, 2023, Commerce issued its preliminary results assigning Kaptan an individual rate of 29.30%. *Steel Concrete Reinforcing Bar from the Republic of Turkey: Preliminary Results of Antidumping Duty Administrative Review and Decision Memorandum*; *2021-2022*, 88 Fed. Reg. 50100, 50101 (Dep't of Commerce Aug. 1, 2023) ("Preliminary AD Results"), Appx236, and Preliminary Decision Memorandum ("PDM"), Appx*227*. In the Preliminary AD Results, Commerce used the invoice date as the date of sale despite the substantial evidence that nothing changed or could be changed from the date of contract to the time of shipment and invoice. *See* PDM at 9, Appx*230*.

Kaptan then submitted a case brief to Commerce on August 31, 2023. *See* Kaptan's Case Brief (Aug. 31, 2023) ("Kaptan Case Br."), Appx270. Therein Kaptan provided evidence and precedent demonstrating that this 2021-2022 review of the rebar from Turkey order is different from prior reviews and that the appropriate date of sale for Kaptan was the contract date. *Id.* at 22-27. There were no changes to the material terms of sale after the contract date, and that all parties agree in the contract that there will be no changes to the terms of the sale. *Id.* at 16. Kaptan explained that

Commerce had ignored its obligation to review the unique circumstances and factual evidence on the record of this review when making its date of sale determination. In doing so, Commerce would have seen the contracts did not change prior to the invoice date and that they were unable to be changed in accordance with Kaptan's board resolution. All material terms of the sale were set on the contract date which should have been used to set the date of sale. *Id.* at 17.

On December 28, 2023, Commerce published Final AD Results, in which Kaptan received a 25.86% rate. *See Final IDM* at 13-21, 88 Fed. Reg. 89663, Appx254. In the Final AD Results, Commerce maintained its incorrect use of the invoice date as the date of sale. *Id.* at 13.

# SUMMARY OF ARGUMENT

The CIT erred in disregarding the contract date and instead holding that the invoice date reflected the date of sale. The invoice is a document generated solely by Kaptan that is intended to be reflective of the prior, binding contract. It is not, standing alone, an enforceable agreement. The contract, by contrast, set forth all material terms – including price and quantity – and was executed by both Kaptan and its US buyer. It formed a binding agreement that could only be modified by a written agreement executed by both parties and with approval by the Kaptan board. The CIT erred in disregarding the contract date on the theory that it was not truly "final" because it could theoretically be modified or amended by mutual agreement, even though it was not.

If the CIT's decision is allowed to stand, no contract for international trade could ever be considered binding, because all agreements can theoretically be modified if parties agree and comply with procedural steps set out in those contracts such as meeting the requirement of amendments being in writing signed by both parties – which is an almost universal contract provision. Such a decision would lead to significant uncertainty and leave exporters with the Hobson's choice when the normal value (home price) increases after a contract is signed: honor your contractual commitment but pay a massive antidumping fine or refuse to honor the

contract and attempt to negotiate a higher price with the US buyer. Nothing in this Court's case law or antidumping law generally requires such an absurd result.

The CIT also erred by deferring to Commerce's rebuttable presumption that the invoice date controls without conducting an independent statutory analysis as required under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). The CIT incorrectly limited *Loper* to instances of statutory ambiguity. *Loper* made clear, however, that courts are also not permitted to defer to agency construction when the agency fills statutory gaps and must instead determine the "best meaning" of a statute, following an independent analysis. The CIT, however, failed to conduct any statutory analysis of its own, instead deferring completely to Commerce's agency-created presumption. Such untethered deference is not permissible under *Loper*.

The CIT decision must therefore be reversed and remanded for a recalculation of the dumping margin using the contract date rather than the invoice date.

# ARGUMENT

## I. STANDARD OF REVIEW

This Court reviews CIT decisions *de novo* applying the substantial evidence standard. *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1373 (Fed. Cir. 2015). It "shall hold unlawful any determination, finding or conclusion found…to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). When reviewing whether Commerce's actions are unsupported by substantial evidence, this Court "reviews the record as a whole, including any evidence that 'fairly detracts from the substantiality of the evidence.'" *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). It "must do more than create a suspicion of the existence of the fact to be established." *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

Commerce must provide a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). This Court must "hold unlawful and set aside agency action, findings, and conclusions found to be— arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" 5 U.S.C. § 706(2)(A). Agency actions are arbitrary if

there has been "a clear error of judgment." *Hyundai Elecs. Indus. Co. v. United States*, 899 F.2d 1204, 1209 (Fed. Cir. 1990).

Commerce's determinations must be consistent with the governing statute and the agency's regulations. This Court's review of Commerce's statutory interpretations is governed by the standard set forth in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) (overruling *Chevron, U.S.A., Inc. v. N.R.D.C., Inc.*, 467 U.S. 837 (1984)). Commerce's interpretations of statutory provisions are not entitled to deference. "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," *Loper Bright*, 603 U.S. at 412, and whether the agency's interpretation reflects "the best reading of the statute[.]" *Id.* at 373.

## II. THE CIT ERRED IN DISREGARDING THE CONTRACT DATE.

The CIT relied on an improper standard to disregard the contract date and instead conclude the invoice date controlled (as the date of sale) for purposes of calculating the comparable home price. Even assuming the CIT applied the correct standard – more on that below – it erred by disregarding the date of the parties *binding* contract. The CIT essentially held that the contract date does not control because the parties to it could agree to amend its terms. *See* Slip Op at 12-13. That reasoning, however, applies to every contract in existence – parties can always agree mutually to amend a contract provided they follow any required formalities (*e.g.,* an

11

amendment in writing signed by both parties). The CIT therefore erred in disregarding the contract date and should be reversed and the case remanded.

### i. Kaptan and the US Buyer Entered into a Binding Contract that Reflects a Meeting of the Minds on Material Terms.

The CIT erred in determining that the contract between Kaptan and its US buyer was not an enforceable agreement and, therefore, did not set the material terms for purposes of establishing the terms of sale. Under Commerce's own regulations, the date of sale is "the date on which the exporter or producer establishes the material terms of sale." Slip Op. at 6 (*quoting* 19 C.F.R. § 351.401(i)), Appx9. The CIT itself noted that the date of sale is determined where the exporter and US buyer have a "meeting of the minds" as to the material terms. *See* Slip Op. at 15-16 ("the relevant standard for the point in time at which the material terms of sale are set is the date at which there was a 'meeting of the minds' as to the terms."), Appx18-19. But the CIT erred by relying on irrelevant points to hold that Kaptan did not rebut the invoice-date presumption even though Kaptan and the US buyer had an enforceable agreement. Each point is addressed below.

First and foremost, it was undisputed below that Kaptan and the US buyer had a binding and enforceable contract. In fact, if Kaptan had tried unilaterally to change the price after the contracts were executed, the US buyer could have refused to do so or sued to enforce the contracts. Thus, the written contracts represent a "meeting

of the minds" with respect to the material terms and the contract date represented the date of sale.

ii.  **The CIT Erred in Disregarding the Contract Date Based on The Parties' Ability to Later Modify It Via Mutual Agreement.**

The CIT's core holding was that the contract dates could not be used because Kaptan and the US buyer could mutually agree to change the material terms thereof. *See* Slip Op at 12-13; 15-18, Appx15-21. If this reasoning is allowed to stand, it would cause a severe disruption in international trade. Exporters to the US would be faced with an impossible dilemma if the normal value (*i.e.* the home price) increases between the contract and invoice dates: 1) honor the contract price and pay a large antidumping fine; or 2) refuse to supply the goods unless the US buyer agrees to pay a significantly higher price and face a claim for breach of contract. Both situations raise prices for US consumers, either through decreased supply or increased prices charged to the US importers.

The CIT's reasoning that the contract terms could be changed did not mean that they were not fixed. The court first looked to Kaptan's questionnaire response, which stated that "[f]or U.S. sales, the parties may amend the latest shipment date, size breakdown, and, to a lesser extent, quantity until the goods are shipped/invoiced." Slip Op. p. 12, Appx15. This answer is consistent with the contract, which the CIT acknowledged "required the parties to agree to any revisions to the contract terms in signed writing," –an almost universal standard contract

provision. *Id.* at p. 15, Appx18. Further, changes to price and quantity required board approval. *Id.*

The CIT relied on the contractual provision setting forth the manner in which material terms can be changed and the requirement of board approval to "conclude[] that substantial evidence on this record supports Commerce's use of the invoice date rather than the contract date as the date of sale." *Id.* p. 18.

A contract, of course, can always be modified via mutual agreement of the parties. Indeed, some courts will enforce oral agreements to modify even when a contract prohibits doing so. *See, e.g., MDNet, Inc. v. Pharmacia Corp.*, 147 F. App'x 239, 243 (3d Cir. 2005) ("Where a requirement is contained in a former contract, the parties may waive the requirement by a later oral modification of the former contract. Parties may orally agree to modify a written contract, even where the written contract contains language prohibiting oral modifications."). Other courts have enforced no-oral-modification clauses but will permit waivers of written terms. *See, e.g., South Hampton Co. v. Stinnes Corp.*, 733 F.2d 1108, 1117-18 (5th Cir. 1984). And still others will enforce oral modifications under estoppel principles. *See, e.g., Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990).

A contract can therefore always be amended by mutual agreement, either in writing or via oral modification if certain conditions are met. Extended to its logical conclusion, the CIT's reasoning effectively means that the contract date can *never*

be the date of sale, because material terms can always be changed via a new agreement or mutually agreeable amendment. That is plainly not the rule, as even the CIT and Commerce concede that the date of sale can at least sometimes be the contract date.

Further, neither the CIT nor Commerce cited any support for the notion that parties have not reached a meeting of the minds based on the fact that an agreement can be modified in the future. The test for a meeting of the minds is whether there is a "mutuality of intent." *See, e.g., Diaz v. United States*, 156 Fed. Cl. 270, 278 (2021) (discussing the elements for a meeting of the minds). The test looks to the present intent of the parties, not their ability to change their minds in the future or to renegotiate. As discussed above, contract law affords parties the ability to modify agreements by mutual consent. That obvious capability does not mean a signed, written contract lacks a meeting of the minds.

Here, as the CIT acknowledges, Kaptan and the US buyers did not modify, or seek to modify, the signed, binding contracts. Instead, their intent and performance remained consistent throughout, and the contracts were performed and the goods provided according to their original terms. So even though contract terms theoretically could have been modified by the parties through mutual agreement, signed amendment, and approval of the Kaptan board, such modification did not occur.

The CIT therefore erred in disregarding the contract date as the date of sale, when the evidence overwhelming demonstrated Kaptan and the US buyers reached a meeting of the minds in their signed, written contract.

### iii. Nothing In the Record Suggests That the Size Breakdown Was Added After the Contract Was Signed.

Material terms such as pricing and quantity unchanged, the CIT's only other basis for disregarding the contract date is an assertion that there was no evidence "to suggest that the contract with size breakdowns was actually signed on the date printed on either of the two versions of the contract." Slip Op. at 14, Appx17.

The CIT is effectively asking Kaptan to prove a negative – that it did not attach the size breakdowns after the contract was executed. Doing so is, of course, impossible. But the only evidence in the record establishes: 1) the contract is dated and signed and 2) that the size breakdown is contained in the final contract. *Id*. at p. 13-14, Appx14-15. Nothing in the record proves, or even suggests, that the size breakdown was attached to the contract after it was executed. The CIT therefore erred in holding that Kaptan did not carry its burden of proof in establishing that the contract contains a meeting of the minds as to all material terms.

### III. THE CIT IMPROPERLY DEFERRED TO COMMERCE DEPARTMENT REGULATIONS AND INTERPRETATIVE GUIDANCE.

The CIT did not undertake a de novo analysis of whether the contract date or invoice date should control. Instead, it relied on an agency-created presumption that

the invoice date is the date of sale unless the exporter can produce "satisfactory evidence" showing that a different date should control. Slip Op. at 7, Appx10 (*quoting Eregli Demir ve Celik Fabrikalari T.A.S. v. United States,* 308 F. Supp. 3d 1297, 1306 (CIT 2018)).

The agency-created rebuttable presumption was outcome determinative here. The CIT did not independently decide that the invoice date was a more appropriate date of sale than the contract date. Instead, it assumed that the invoice date applied and determined whether Kaptan sufficiently rebutted the presumption and showed via substantial evidence that the contract date should be used instead.

The CIT, for example, never undertook the analysis to determine whether the invoices truly demonstrated a meeting of the minds. Unlike the written contract, which is executed by both parties, the invoice is unilaterally generated by Kaptan. It is not signed by the buyer and, apart from being consistent with the contract the CIT disregarded, has no indicia on its face of a meeting of the minds. The CIT would therefore have to look at performance – payment of the invoice, shipment and acceptance of the goods detailed therein in the quantity listed – to determine whether it would qualify as an implied-in-fact contract. *See Harris v. United States*, 595 F. App'x 993, 994 (Fed. Cir. 2015) (holding that an invoice, standing alone, is not an enforceable contract). The CIT did not undertake any such analysis, instead relying solely on the agency-created presumption. This reliance is misplaced under the

Supreme Court's landmark decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

### i. The Agency-Created Invoice Date Presumption Does Not Survive *Loper*.

The CIT gave short shift to *Loper Bright*, holding that it did not apply "because both parties agree that 'date of sale' in the statute means the date when the material terms of sale were established. There is therefore no real dispute about the ambiguity or meaning of the statute." Slip Op. at 9 n.5, Appx12. The CIT misstated the issue. It is not that the base interpretation of "date of sale" is in dispute. The issue is that Commerce's invoice-date-presumption rule is inconsistent with the statute and cannot survive without the agency deference that was specifically rejected by the Supreme Court in *Loper*.

First, the CIT was incorrect in limiting *Chevron* deference, and thus *Loper*, to disputes over "ambiguity or meaning of the statute." *Id.* As *Loper* pointed out, *Chevron* deference also applies when a statute does not directly speak to an issue. *See Loper*, 603 U.S. at 397 ("the [Chevron] Court articulated a second step applicable when 'Congress had not directly addressed the precise question at issue.'").

Here, Congress did not address how to determine the date of sale. Slip Op. at 9 ("The governing statute does not specify the method by which Commerce must

determine the date of sale for the purpose of determining the normal value of the subject merchandise."). Commerce "fill[ed the] statutory 'gap,'" *Loper*, 603 U.S. at 397, by creating the rebuttable invoice-date presumption. Slip Op. at 10 ("Commerce's regulations create a rebuttable presumption that Commerce will use the invoice date as the date of sale[.]"). The question is therefore not whether the statute is ambiguous; it is whether Commerce's invoice date gap-filler is a correct interpretation of the statute. As *Loper* held, a "statute still has a best meaning, necessarily discernible by a court deploying its full interpretive toolkit." *Loper,* 603 at 408-09. The CIT erred in failing to "deploy[] its full interpretive toolkit" to discern that meaning.

The CIT therefore erred in deferring the Commerce's agency-created presumption in the face of what it perceived as statutory silence. That reasoning fails under *Loper*, which only permits deference to agency interpretation "when a particular statute delegates authority to an agency consistent with constitutional limits." *Id.* at 413. There is no such legislative delegation here. Accordingly, the case must be reversed and remanded for an independent judicial interpretation of the statute, without applying the agency-created rebuttable presumption.

### ii. Absent *Chevron*-style Deference, the Invoice Date Presumption Cannot Stand.

As *Loper* held, courts are tasked with determining the "best" interpretation of a statute. *Loper,* 603 at 408-09. A few related statutory provisions are at play here.

19 U.S.C. § 1673 directs Commerce to "impose[] . . . an antidumping duty . . . in an amount equal to the amount by which the normal value [home price] exceeds the export price . . . for the merchandise." The "normal value" must then be calculated "at a time reasonably corresponding to the time of sale used to determine the export price or constructed export price…." 19 U.S.C. § 1677b(a)(1)(A). Kaptan and Commerce stipulated below that the "time of sale" is the date on which there is a meeting of the minds as to the material terms of sale.

The governing statutes are silent as to the manner in which Commerce calculates the time of sale. The question, then, is whether Commerce's rebuttable presumption in favor of the invoice date is the "best meaning" of the statute. *Loper,* 603 at 408-09. It plainly is not. As this Court has held, an invoice is simply a document created by a single party. *See Harris*, 595 F. App'x at 994. It does not on its face reflect any mutual assent of the parties to the terms set forth therein and does not bind either party to its terms. *Id.* (holding that the government was not bound by an arbitration agreement contained on an invoice).

A written contract, by contrast, is executed by the buyer and seller and sets forth the terms of the agreement. It is also binding and can only be modified by further mutual agreement, waiver, or estoppel. By definition, the written, signed contract reflects the meeting of the mind of the parties. An invoice might be

reflective of that agreement, or consistent with it – as is the case here – but the meeting of the minds is formed pursuant to the contract, not the subsequent invoice.

The agency-created presumption in favor of an invoice date over the contract date as reflecting the "meeting of the minds" therefore cannot survive *Loper*'s requirement for a court to determine the "best meaning" of a statute. For this reason too, the CIT's decision must be reversed and the case remanded.

**CONCLUSION**

Based on the foregoing, Plaintiff-Appellant Kaptan respectfully requests the CIT's judgment be reversed and remanded for further consideration consistent with this Court's opinion.

Respectfully submitted,


/s/ Daniel L. Delnero

Daniel L. Delnero
Allen W. Yee
**BGD LEGAL & CONSULTING, LLC**
3017 Bolling Way - Suite 130
Atlanta, GA 30305

***Counsel to Plaintiff-Appellant Kaptan
Demir Celik Endustrisi ve Ticaret A.S.***

Dated: May 19, 2025

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B).

2.      This brief contains  <u>4623</u>  words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Federal Rule of Appellate Procedure 32(b)(2).

3.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman 14-point font.


Dated: May 19, 2025                          <u>/s/ Daniel L. Delnero</u>
                                             Daniel L. Delnero

                                             **BGD LEGAL & CONSULTING, LLC**
                                              3017 Bolling Way NE, Suite 130
                                             Atlanta, GA 30305
                                             Email: daniel.delnero@bgdlc.com

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF CONFIDENTIAL MATERIAL</u>

**Case Number:**    2025-1559

**Short Case Caption:**   Kaptan Demir Celik Endustrisi ve Ticaret AS. v. US

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains _____ number of unique words (including numbers) marked confidential.

[x] This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

[ ] This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

[ ] This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 05/19/2025

Signature:   /s/Daniel L. Delnero

Name:   Daniel L. Delnero

# CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of May, 2025, a copy of the foregoing was served on the following parties by operation of the Court's electronic-filing system:

Ian Andrew McInerney
**United States Department of Commerce**
1401 Constitution Avenue NW
Washington, DC 20230
Email: ian.mcinerney@trade.gov

Joshua Moore
**United States Department of Justice**
Commercial Litigation Branch, Civil Division
PO Box 480, Ben Franklin Station
Washington, DC 20044
Email: joshua.w.moore@usdoj.gov

Jeffrey Owen Frank
**Wiley Rein, LLP**
2050 M Street NW
Washington, DC 20036
Email: jfrank@wiley.law

Stephen Morrison
**Wiley Rein, LLP**
2050 M Street NW
Washington, DC 20036
Email: smorrison@wiley.law

Maureen E. Thorson
**Wiley Rein, LLP**
2050 M Street NW
Washington, DC 20036
Email: mthorson@wiley.law

John R. Shane
**Wiley Rein, LLP**
2050 M Street NW
Washington, DC 20036
Email: jshane@wiley.law

Respectfully Submitted on May 19, 2025.

/s/ Daniel L. Delnero
Daniel L. Delnero
Allen W. Yee
**BGD LEGAL & CONSULTING, LLC**
3017 Bolling Way NE, Suite 130
Atlanta, GA 30305
Email: daniel.delnero@bgdlc.com

## ADDENDUM OF REQUIRED DOCUMENTS

| Tab No. | Document | Pages |
|---|---|---|
| 1 | *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States, Slip Op. 25-4 Judgment (Ct. Int'l Trade January 15, 2025)* | 001-001 |
| 2 | *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States, Slip Op. 25-4 Opinion and Order (Ct. Int'l Trade January 15, 2025)* | 002--021 |

**TAB 1 -** *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, Slip Op. 25-4 Judgment (Ct. Int'l Trade January 15, 2025)

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., | |
| Plaintiff, | Before: Jane A. Restani, Judge |
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., | Court No. 24-00018 |
| Plaintiff-Intervenor, | |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| REBAR TRADE ACTION COALITION, | |
| Defendant-Intervenor. | |

### JUDGMENT

This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision it is hereby

ORDERED, ADJUDGED, and DECREED that the Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of the Antidumping Duty Administrative Review; 2021-2022, 88 Fed. Reg. 89663 (Dec. 28, 2023) are **SUSTAINED**.

_/s/ Jane A. Restani_
Jane A. Restani, Judge

Dated: January 15, 2025
New York, New York

**TAB  2 -**

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, Slip Op. 25-4, Opinion and Order
(Ct. Int'l Trade January 15, 2025)

Slip Op. 25-4

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., | |
| Plaintiff, | Before: Jane A. Restani, Judge |
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., | Court No. 24-00018 |
| Plaintiff-Intervenor, | |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| REBAR TRADE ACTION COALITION, | |
| Defendant-Intervenor. | |

## <u>OPINION AND ORDER</u>

[The court sustains the Department of Commerce's date of sale determination, its DIFMER analysis, and the resulting antidumping rate in its Final Result of the Periodic Review and denies Plaintiff's Motion for Judgment on the Agency Record.]

Dated: January 15, 2025

<u>Leah N. Scarpelli</u>, ArentFox Schiff LLP, of Washington, DC, argued for the plaintiff, Kaptan Demir Celik Endustrisi ve Ticaret A.S., and for the plaintiff-intervenor, ICDAS Celik Enerji Tersane ve Ulasim Sanayi, A.S.  With her on the brief were <u>Jessica R. DiPietro</u>, <u>Matthew Mosher Nolan</u>, and <u>Nancy Aileen Noonan</u>.

<u>Joshua Wilson Moore</u>, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With him on the brief was <u>David W. Richardson</u>, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance of Washington, DC.

<u>Maureen E. Thorson</u>, Wiley Rein, LLP, of Washington, DC, argued for defendant-intervenor, Rebar Trade Action Coalition.  With her on the brief were <u>Alan H. Price</u>, <u>Jeffrey O. Frank</u>, <u>John R. Shane</u>, and <u>Stephen A. Morrison</u>.

Restani, Judge: Before the court is a motion for judgment on the agency record pursuant to USCIT Rule 56.2 challenging the final results of the United States Department of Commerce ("Commerce"). Pl.'s Final Mot. for J. on the Agency Record, ECF No. 42 (July 23, 2024) ("Pl. Mot."). The final results at issue stem from Commerce's administrative review into allegations that domestic sales of certain Steel Concrete Reinforcing Bar ("Rebar") from the Republic of Turkey were made at less-than-fair-market-value between July 1, 2021, and June 30, 2022. See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 87 Fed. Reg. 54463 (Dep't Commerce Sept. 6, 2022) ("Initiation of Investigation"); Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of the Antidumping Duty Administrative Review; 2021-2022, 88 Fed. Reg. 89663 (Dec. 28, 2023) ("Final Results"); Steel Concrete Reinforcing Bar From the Republic of Turkey and Japan: Amended Final Affirmative Antidumping Duty Determination for the Republic of Turkey and Antidumping Duty Orders, 82 Fed. Reg. 32532 (Dep't Commerce July 14, 2017) ("Antidumping Order").

Plaintiff, Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan") and Plaintiff-Intervenor, Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. ("Icdas"), request the court hold that Commerce's decision to use the invoice date as the date of sale for sales of subject merchandise to the U.S. market is unsupported by substantial evidence. They also challenge Commerce's calculation of the differences in merchandise ("DIFMER") adjustment as impermissibly distortive. Defendant, the United States ("Government") and defendant-intervenor, the Rebar Trade Action Coalition, ask that the court sustain the Final Results.

## BACKGROUND

On July 14, 2017, Commerce published in the Federal Register the Antidumping Order on steel concrete reinforcing bar from the Republic of Turkey ("Turkey"). Antidumping Order, 82

Fed. Reg. 32532.  On September 6, 2022, Commerce published the initiation notice for the 2021–

2022 administrative review of the Antidumping Order covering steel rebar from Turkey.  See

Initiation of Antidumping and Countervailing Duty Administrative Reviews, 87 Fed. Reg. 54463,

54473 (Dep't Commerce Sept. 6, 2022).  Commerce selected Kaptan as a mandatory respondent

for individual examination.  See Memorandum from R. Copyak to S. Thomson re: Respondent

Selection Memorandum for Administrative Review of the Antidumping Duty Order on Steel

Concrete Reinforcing Bar from the Republic of Turkey; 2021-2022 at 1, C.R. 5, P.R. 29 (Oct. 7,

2022).  On July 27, 2022, Plaintiff filed a request for administrative review.  Kaptan's Request for

Antidumping Administrative Review, P.R. 4 (July 27, 2022).  Plaintiff-Intervenor Icdas also filed

a request for an administrative review on July 28, 2022.  Turkish Parties' Request for Antidumping

Administrative Review, P.R. 6 (July 28, 2022).

       On August 1, 2023, Commerce issued its preliminary results for Period of Review ("POR")

of July 1, 2021, through June 30, 2022, in which it found that Kaptan's sales of the subject

merchandise to the United States were below normal value.  Steel Concrete Reinforcing Bar From

the Republic of Turkey, 88 Fed. Reg. 50100-02, 50100–01 (Dep't Commerce Aug. 1, 2023)

("Preliminary Results"), and accompanying Preliminary Decision Memorandum, Memorandum

from J. Maeder to A. Elouaradia, re: Decision Memorandum for the Preliminary Results of the

Antidumping Duty Administrative Review of Steel Concrete Reinforcing Bar from the Republic

of Turkey; 2021-2022, P.R. 120 (July 26, 2023) ("PDM").  Commerce assigned Kaptan a dumping

margin of 29.30 percent.  Memorandum from B. Ballesteros to The File, re: Preliminary Results

Analysis Memorandum for Kaptan Demir Celik Endustrisi Ve Ticaret A.S./Kaptan Metal Dis

Ticaret Ve Nakliyat A.S. at 1, P.R. 121 (July 6, 2023) ("PAM").  In its analysis, Commerce relied

on the invoice date rather than the contract date as the date of sale.  PDM at 9.  Kaptan submitted

a case brief to Commerce on August 31, 2023, contesting Commerce's choice of the invoice date

as the date of sale.  See Kaptan's Admin. Case Brief, C.R. 377, P.R. 136 (Aug. 31, 2023) ("Case

Br.").  To support its factual contention that the contract date was the date of sale, Kaptan cited

the lack of any changes to the material terms of the contract at issue, its business practices for its

U.S. exports, and a Board Resolution barring changes to price and quantity terms of a contract

without Board approval.  Case Br. at 16–27.  Kaptan also contested Commerce's DIFMER

adjustment methodology as distorting the calculation of the dumping margin.[1]  Id. at 31.

On December 20, 2023, Commerce issued the Final Results of the administrative review.

The results were published in the Federal Register on December 28, 2023.  See Final Results, 88

Fed. Reg. 89663.  In the Final Results, Commerce maintained its use of the invoice date as the date

of sale and its DIFMER adjustment methodology.  See Memorandum from S. Fullerton to J.

Maeder, re: Issues and Decision Memorandum for the Final Results of the Antidumping Duty

Administrative Review Antidumping; 2021-2022 at 13–21, P.R. 150 (Dec. 20, 2023) ("IDM").  It

assigned Kaptan a 25.86 percent dumping rate.  Memorandum from B. Ballesteros to The File, re:

Final Results Analysis Memorandum for Kaptan Demir Celik Endustrisi Ve Ticaret A.S./Kaptan

Metal Dis Ticaret Ve Nakliyat A.S. at 1, P.R. 151 (Dec. 20, 2023).  During the POR for this

antidumping analysis, Turkey experienced an annual inflation rate of greater than twenty-five

percent.  Letter from Colakoglu & Kaptan to U.S. Dep't of Commerce, re: Notice of Inflation Rate

Above 25 Percent at 1, Attachment 1, P.R. 37 (Oct. 21, 2022); see also PDM.

---

[1] The DIFMER analysis is part of Commerce's calculation of the normal value of the subject
merchandise.  When the exact product being exported into the United States is not also sold in the
home market, Commerce selects a similar merchandise and calculates the normal value of that
merchandise as a stand-in.  Commerce then conducts the DIFMER analysis to adjust the normal
value so that it does not improperly reflect production cost discrepancies that arise from physical
differences in the products.  See 19 C.F.R. § 351.411; 19 U.S.C. § 1677b(a)(6)(C)(ii).  This process
will be discussed in further detail.

Commerce primarily relied on three factors to make its determination that the invoice date was the proper date of sale.  First, Kaptan's response in its section A questionnaire indicated that the parties could amend the shipment date, size breakdown, and potentially the quantity until the goods are shipped or invoiced.  IDM at 15.  Second, one version of the contract left the size breakdown open until a later date.  Id. at 16.  Third, Kaptan's contracts allowed for changes to be made to material terms after the contract date.  Id.  Based on these considerations, Commerce concluded that the material terms of the sale were established on the invoice date and that its calculation of the dumping rate should reflect the invoice date, not the contract date.

On January 29, 2024, Kaptan commenced the instant action against the Government pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II).  Summons, ECF No. 1 (Jan. 29, 2024).  In its Complaint, Kaptan claims that the Antidumping Order is unsupported by substantial evidence or is otherwise contrary to law because Commerce incorrectly determined Kaptan's date of sale and that Commerce's calculation of Kaptan's duty rate using an inflation-adjusted DIFMER calculation improperly caused distortions based on time differences rather than differences between the product characteristics.  Compl. at 7–8, ECF No. 9 (Feb. 26, 2024).

For the reasons set out below, the court sustains the Department of Commerce's Final Results and denies Plaintiff's Motion for Judgment on the Agency Record.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and section 516A of the Tariff Act of 1930 (the "Act"), codified as amended, 19 U.S.C. § 1516(a)(2) (2012).  The court sustains Commerce's results in an AD investigation unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]"  19 U.S.C. § 1516a(b)(1)(B)(i); see also Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996).

## DISCUSSION

### I.    Legal Framework

In an antidumping analysis, Commerce determines whether the subject merchandise is being sold or likely to be sold at a less than fair value price in the United States.  19 U.S.C. § 1673. Thus, Commerce must conduct a "fair comparison" of the prices for a good sold in the respondent company's home market ("normal value") with the prices that they charge for the same or similar good in the U.S. market ("export price")[2] to determine whether the good is being, or is likely to be, sold at less than fair value.  See 19 U.S.C. §§ 1677a; 1677b(a); see also Smith-Corona Grp. v. United States, 713 F.2d 1568, 1577–78 (Fed Cir. 1983).

To determine the normal value of the subject merchandise, after eliminating below cost sales, Commerce considers the price for goods sold in the home market during the relevant POR. The normal value must be from "a time reasonably corresponding to the time of sale used to determine the export price," leading Commerce to identify a specific date on which the sale occurred (the "date of sale").  19 U.S.C. § 1677b(a)(1)(A).  The date of sale is the date on which "the exporter or producer establishes the material terms of the sale."  19 C.F.R. § 351.401(i) (2020).  The date of sale becomes an important variable at this stage of the process because, while it affects the price comparison, it also establishes which sales are within the POR and thus subject to that POR's administrative review.  Commerce's regulations provide that:

> In identifying the date of sale of the subject merchandise or foreign like product, [Commerce] normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business.  However, [Commerce] may use a date other than the date of invoice if [Commerce] is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.

---

[2] The court will use "export price" to mean export price or constructed export price.

Id.  Thus, under normal circumstances, the date of sale regulation "establishes a 'rebuttable presumption' in favor of the invoice date unless the proponent of a different date produces satisfactory evidence that the material terms of sale were established on that alternate date."  Eregli Demir ve Celik Fabrikalari T.A.S. v. United States, 308 F. Supp. 3d 1297, 1306 (CIT 2018) (citations omitted).  The material terms generally include the terms of price, quantity, payment, and delivery.  Id. at 1307 (citing Sahaviriya Steel Indus. Pub. Co. v. United States, 34 CIT 709, 727, 714 F. Supp. 2d 1263, 1280 (2010), aff'd, 649 F.3d 1371 (Fed. Cir. 2011)).

To determine which sales to use for the price comparison, Commerce calculates the Cost of Production ("COP") during a time period that would permit production of the product in the ordinary course of business.  19 U.S.C. § 1677b(b)(3)(A).  Once Commerce determines the COP, it then calculates the weighted average COP for each individual product model, also called "CONNUMs,"[3] across the POR with production quantity as the weighting factor.  IDM at 23.  When, as here, the home market experienced high inflation, Commerce calculates the COP on a monthly basis rather than across the entire POR to minimize the impact of inflation on the analysis.  Id. at 23.  Once Commerce has calculated the COP, it then compares the COP to the price of home market sales to determine which sales were made below cost and excludes these sales from the home market sales database.  19 U.S.C. § 1677b(b)(1).  Ordinarily, Commerce then compares the

---

[3] Commerce uses the term "CONNUM" to refer to an individual product model.  See, e.g., Memorandum from S. Fullerton to J. Maeder, re: Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review Antidumping; 2021-2022, at 2, P.R. 150, (Dec. 20, 2023) ("IDM").  This is an abbreviation of "control number."  Id.  A "control number" is assigned to each distinct model of subject merchandise sold in the home and U.S. markets based on relevant product characteristics.  See, e.g., Kaptan's Response to the Department's Section C Questionnaire at C-10, C.R. 48-70, P.R. 61 (Dec. 8, 2022).  The court uses "CONNUM," "product," and "merchandise" interchangeably.

normal value to the export price to determine whether and how much dumping has occurred.  19

U.S.C. §§ 1673; 1677a; 1677b.

Commerce, however, employs an additional step in the analysis when the exporter does

not sell the same merchandise in the home market.  In such a scenario, Commerce picks similar

merchandise being sold in the home market as the merchandise being exported.  Commerce

conducts a DIFMER analysis to determine what production cost differences arise from physical

differences in the products and adjusts the normal value accordingly.  In high inflation contexts,

similar to its COP process described above, Commerce conducts the DIFMER analysis on a

monthly-indexed basis rather than across the entire POR to minimize the impact of inflation on

the analysis.  See 19 C.F.R. § 351.411; 19 U.S.C. § 1677b(a)(6)(C)(ii); IDM at 22–24.

## II.    Commerce's use of the invoice date for the date of sale is supported by substantial evidence

Kaptan argues that Commerce improperly used the invoice date to determine the date of

sale.  Kaptan asserts that instead, Commerce should have used the contract date because the

material terms of the sale were established on the contract date and did not change during the POR.

Pl. Mot. at 9.  Kaptan contends that the material terms were set at the time of the contract because

of Kaptan's sales practices for its exports to the United States, along with an internal resolution of

Kaptan's Board of Directors that required that all contracts be approved by the Board and once

approved, could not be altered.  Id. at 5.  Commerce argues that its use of the invoice date as the

date of sale was supported by substantial evidence because the initial questionnaire response

indicated that the material terms of sale were not set on the date of contract.  Def.'s Resp. to Pl.'s

Mot. for J. on the Agency Record at 27, ECF No. 53 (Sept. 20, 2024) ("Gov. Resp.").   Further,

Commerce points to ambiguity as to when the contracts were actually signed, along with language

in the contract indicating that the parties could revise and modify the contract after the contract

date, to argue that the material terms were not set on the contract date. Oral Argument at 41:20;

Gov. Resp. at 26.

The governing statute does not specify the method by which Commerce must determine

the date of sale for the purposes of determining the normal value of the subject merchandise.[4] The

Statement of Administrative Action accompanying the Uruguay Round Agreements Act defines

"date of sale" as "a date when the material terms of sale are established." Uruguay Round

Agreements Act, Statement of Administrative Action, H.R. Rep. No 103-316, vol. 1, at 810 (1994),

---

[4] The parties dedicate much of their briefing to the issue of the deference owed to Commerce's antidumping determination in the wake of the <u>Loper Bright</u> decision due to the statute's silence regarding the proper method to determine the date of sale. <u>See</u> Pl.'s Final Mot. for J. on the Agency Record at 10–20, ECF No. 42 (July 23, 2024) ("Pl. Mot."); Def.'s Resp. to Pl.'s Mot. for J. on the Agency Record at 15–24, ECF No. 53 (Sept. 20, 2024) ("Gov. Resp."); Rebar Trade Coalition Resp. to Pl. Mot. for J. on the Agency Record at 19–27, ECF No. 51 (Sept. 20, 2024) ("Rebar Resp."); Pl. Reply Br. at 3–11, ECF No. 57 (Nov. 1, 2024) ("Pl. Reply"). Commerce contends that <u>Loper Bright</u> is not applicable here because <u>Loper Bright</u> only concerns step two of the <u>Chevron</u> analysis, which occurs when a statute is ambiguous. Gov. Resp. at 17. Commerce argues that the term "date of sale" in the statute is not ambiguous because it simply means the "date on which the material terms of sale are established." Gov. Resp. at 18 (citing <u>Allied Tube & Conduit Corp. v. United States</u>, 24 CIT 1357, 1368, 127 F. Supp. 2d 207, 217 (2000)); <u>see also</u> Rebar Resp. at 20. Kaptan argues that the statute is ambiguous because it does not define "date of sale," meaning the court must independently interpret the statute's best meaning. Pl. Mot. at 10 (citing <u>Loper Bright Enterprises v. Raimondo</u>, 603 U.S. 369, 399 (2024)). Kaptan does not dispute, however, that "date of sale" in the statute means the date at which the material terms of the sale were established. Pl. Mot. at 10–11. Rather, Kaptan disputes Commerce's methodology for determining when the material terms of the sale are established. Under step two of <u>Chevron</u>, when a statute was silent or ambiguous with respect to the specific issue at hand, the court evaluated whether Commerce's interpretation was "based on a permissible construction of the statute" and then inquired into "the reasonableness of Commerce's interpretation." <u>Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.</u>, 467 U.S. 837, 843 (1984). Now, generally courts exercise their independent judgment in deciding statutory meaning when the statute is silent or ambiguous regarding Commerce's authority. <u>See</u> <u>Loper Bright</u>, 603 U.S. at 393. The court need not resolve this issue, however, because both parties agree that "date of sale" in the statute means the date when the material terms of sale were established. There is therefore no real dispute about the ambiguity or meaning of the statute. The court looks only to whether Commerce's date of sale analysis was supported by substantial evidence as required by 19 U.S.C. § 1516a(b)(1)(B)(i).

reprinted in 1994 U.S.C.C.A.N. 4040, 4153.  Congress designated the Statement of Administrative

Action as "an authoritative expression by the United States concerning the interpretation of the

Uruguay Round Agreements and this Act . . ." 19 U.S.C. § 3512(d).  The material terms of sale may

include price, quantity, delivery and payment terms, and quantity tolerance level.  See, e.g.,

Sahaviriya Steel Indus., 34 CIT at 727, 714 F. Supp. 2d at 1280.

As discussed above, Commerce's regulations create a rebuttable presumption that

Commerce will use the invoice date as the date of sale, but that Commerce may use another date

if it better reflects the date on which the material terms of the sale were established.  See 19 C.F.R.

§ 351.401(i); see also Eregli, 308 F. Supp. 3d at 1306.  This presumption is meant to be flexible

and is not irrefutable.  For example, the Preamble to Commerce's regulation states that "[i]n some

cases, it may be inappropriate to rely on the date of invoice as the date of sale, because the evidence

may indicate that, for a particular respondent, the material terms of sale usually are established on

some date other than the date of invoice."  Preamble, 62 Fed. Reg. 27296, 27349 (Dep't Commerce

May 19, 1997) ("Preamble"); see also 19 C.F.R. § 351.401(i).  Commerce has a "'well-established

and longstanding practice' of looking beyond the invoice date to the parties' actual course of

conduct, as well as the parties' expectations concerning the transaction, to determine whether an

earlier date—such as the contract date—represents the point at which the parties reached a meeting

of the minds on the material terms of sale."[5] Nucor Corp. v. United States, 33 CIT 207, 259–260,

612 F. Supp. 2d 1264, 1308 (2009).

---

[5] In its brief, Kaptan argues that Commerce has been inconsistent in its approach to the date of sale
determination, meaning that it has not applied the "single, best meaning" of the statute as required
by Loper Bright.  Pl. Mot. at 17 (citing Loper Bright, 603 U.S. at 400).  Kaptan argues that
Commerce has been contradictory in its definition of what is a "material" term of sale and what
constitutes a material change to those terms.  Pl. Mot. at 15–16.  Kaptan does not allege, however,
that Commerce misidentified a material term in the contract at issue.  Rather, this dispute centers
on whether the material terms themselves were set at the time of the contract.  The court therefore

A party proposing a date other than the invoice date must show that the administrative record as a whole demonstrates that the material terms were "finally" and "firmly" established on that date and that the agreement was not merely a preliminary agreement in an industry where renegotiation is common.  See Preamble at 27348–49; see also Yieh Phui Enterprise Co. v. United States, 35 CIT 1122, 1125–28, 791 F. Supp. 2d 1319, 1322–25 (2011).  Accordingly, the question here is whether Kaptan has pointed to sufficient evidence in the administrative record to show that Commerce's decision to use the invoice date as the date of sale was not supported by substantial evidence.

Kaptan reported in its initial questionnaires that the material terms of sale were established on the contract date.  Kaptan's Response to the Department's Section A Questionnaire at A-20, C.R. 7-18, P.R. 45 (Nov. 7, 2022) ("Kaptan's Sec. A").  In its Final Results, Commerce, however, found that the administrative record as a whole did not rebut the presumption in favor of using the invoice date and that the material terms were not established until the invoice date.  IDM at 13, 20–21.  To make this determination, Commerce relied on several pieces of evidence.  First, in its response to Commerce's Anti-Dumping Questionnaire, Kaptan stated that "[f]or U.S. sales, the parties may amend the latest shipment date, size breakdown, and, to a lesser extent, quantity until the goods are shipped/invoiced."  Kaptan's Sec. A at A-23; IDM at 15.  Second, one of the signed versions of the contract states that the size breakdown "will be advise[d] latest by 15.02.2022" but contradictorily has a size breakdown attached.  Kaptan's Sec. A Ex. A-7 at 67; see IDM at 16; PAM at 3.  Third, a provision of the contract states that "any revision and/or modification to the present contract are [sic] valid only if made in writing and duly signed by both parties."  Kaptan's

---

does not address whether Commerce has been inconsistent in what it considers to be a "material" term of sale or a material change to those terms.

Response to the Department's Section C Questionnaire Ex. C-6.b at 138, C.R. 48-70, P.R. 61 (Dec. 8, 2022) ("Kaptan's Sec. C"); see IDM at 16.  Presumably, this indicated to Commerce that amendments to the contract were possible.  The court addresses each of these considerations in turn.

### a.  Kaptan's questionnaire response suggests that the material terms were not established on the contract date.

Commerce argues that Kaptan's section A questionnaire response indicates that the material terms of sale were not established at the date of contract.  Gov. Resp. at 24.  Kaptan contends that this response was merely a general answer that was clarified by Kaptan's subsequent questionnaire responses which shows that there were no changes to the material terms of the contract.  Oral Argument at 7:19.  Kaptan argues that Commerce's reliance on this initial questionnaire fails to properly consider other evidence that Kaptan submitted throughout the review.  Pl. Reply at 12–13.

As indicated, the response at issue states that "[f]or U.S. sales, the parties may amend the latest shipment date, size breakdown, and, to a lesser extent, quantity until the goods are shipped/invoiced."  Kaptan's Sec. A at A-23; IDM at 15.  In the questionnaire response, Kaptan also notes that "Kaptan continues to review its books and records and will provide further data in support of its date of sale reporting in the Section C questionnaire response."  Kaptan's Sec. A at A-20.

Kaptan's section A questionnaire response suggests that the material terms were not established on the contract date because they could be amended by the contracting parties up until the shipment or invoice date.  Even if the court were to accept Kaptan's contention that the response was either improperly included or was merely an imprecise initial response that was

clarified by the later questionnaire responses, Kaptan has cited no evidence of record that it explicitly alerted Commerce to such a mistake.  Oral Argument at 9:55.  Commerce therefore properly relied on this general description as part of its date of sale analysis.  Commerce however should ground its date of sale analysis primarily on the facts of the sale in question, as well as the practice of the relevant industry.  See Preamble at 27348–49; see also Yieh Phui Enterprise, 35 CIT at 1123–1127, 791 F. Supp. 2d at 1322–25.  Accordingly, the court turns to the other pieces of evidence on which Commerce relied as those considerations focus on the actual sale at issue.

### b. The versions of the sales contract provided do not establish when the material terms were set.

Commerce argues that the material terms of the sale were not established on the contract date because one of the two signed versions of the contract did not establish the size breakdown. Gov. Resp. at 31.  Kaptan contends that the version of the contract Commerce references was merely a prior draft of the contract and that the first page of the draft contract was removed and replaced with the updated version when the contract was finalized and signed.  Pl. Mot. at 30 (citing Kaptan's Response to the Department's Supplemental Sections A-C Questionnaire at 29, C.R. 180-246, P.R. 89-90 (June 1, 2023) ("Kaptan's Supp. A-C")).

The version of the contract on which Commerce relies states that the size breakdown "will be advise[d] latest by 15.02.2022."  Kaptan's Sec. A Ex. A-7 at 67.  A size breakdown is attached to this version of the contract.  Id. at 73–74.  This version has the date printed on the top of the page and is signed and initialed.  Id. at 67–74.  Every page of both the contract and the size breakdown attachment is initialed.  Id.  None of the signatures or initials, however, are dated.  Id. The other version of the same contract specifies that the size breakdown is "as per attached sheet" and has the same date printed on the top of the page.  Kaptan's Sec. C Ex. C-6.b at 199.  This

version of the contract also attaches the same size breakdown, and every page of the contract and size breakdown is signed or initialed. Id. at 199–206. The pagination on both versions of the contract and the size breakdown is identical. Kaptan's Sec. A Ex. A-7 at 67–74; Kaptan's Sec. C Ex. C-6.b at 199–206.

The fact that a prior version of the contract states that the size breakdown "will be advise[d] latest by 15.02.2022" has little bearing on whether the material terms were established on the contract date. Even if the court were, arguendo, to agree with Commerce that this version of the contract was more than a rough draft, the version of the contract with the size breakdown "as per attached sheet" is dated with the same date. This would mean that the contract is the same regardless of which version the court considers. Instead, the court notes the lack of record evidence that the final contract was actually signed after the size breakdown was attached, as Commerce points out in the Preliminary Analysis Memorandum. PAM at 3. While the contract is signed and initialed, none of the signatures are dated or have any kind of time stamp. Similarly, the size breakdown attachment is not dated. As noted above, Kaptan has the burden of showing that the record demonstrates that the material terms were firmly and finally established on the contract date rather than the invoice date. See Preamble at 27348–49; see also Yieh Phui Enterprise, 35 CIT at 1125-28, 791 F. Supp. at 1322–25. Kaptan has not provided any evidence to suggest that the contract with size breakdowns was actually signed on the date printed on either of the two versions of the contract.[6] As the contract date is ambiguous in the two documents, Commerce reasonably found that it was not determinative evidence of the date of sale.

---

[6] The first page of the "rough draft" and the "final" version of the contract submitted are identical except for the phrase regarding provision of the size breakdown. Tellingly, the initials on both pages are identical in both form and placement. That the initials are identical suggests to the court that an incomplete version of this page was initialed, and the terms were amended later. This

    **c.  The terms of the contract and the Board Resolution allow for deviation in the material terms of the sale.**

    Commerce argues that the material terms of the sale were not established on the contract date because the contract itself required the parties to agree to any revisions to the contract terms in signed writing.  From this provision, Commerce extrapolates that the material terms were not established on the contract date because it was possible for the parties to amend the contract.  <u>See</u> Gov. Resp. at 25.  Kaptan contends that this contract language is boilerplate, and that the language actually suggests that the material terms of the contract were established on the contract date because any revision to the terms requires a formal modification process.  Pl. Reply at 14.  Kaptan argues that this contract provision, along with the Board Resolution barring changes to price and quantity terms of a contract without board approval, suggests that the contract date was the proper date of sale.  Pl. Mot. at 29; Case Br. at 16–27.

    Prior case law focuses on the issue of whether the presence of quantity tolerances in the contract mean that the material terms were not established in the contract.  <u>See</u> <u>Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States</u>, 693 F. Supp. 3d 1368 (CIT 2024) (citing <u>Nakornthai Strip Mill Co. Ltd. v. United States</u>, 33 CIT 326, 614 F. Supp. 2d 1323 (2009); <u>Eregli</u>, 308 F. Supp. 3d at 1297; <u>Certain Cut-to-Length Carbon Steel Plate from Romania</u>, 72 Fed. Reg. 6522 (Dep't Commerce Feb. 12, 2007)).  Apparently, tolerances were within normal minimal levels and the parties do not raise this issue.  Instead, they dispute the rigidity of the contract language required for a material term to be set.  As discussed previously, the relevant standard for the point in time at which the material terms of sale are set is the date at which there was a "meeting of the minds"

---

inference is consistent with Commerce's statement in the Preliminary Analysis Memorandum that the pages were signed before the size breakdown was provided.  <u>PAM</u> at 3.

as to the terms.  See Nucor Corp., 33 CIT at 259–260, 612 F. Supp. 2d at 1308; Eregli, 308 F.

Supp. 3d at 1306–07 (citations omitted).  The material terms generally include the terms of price,

quantity, payment, and delivery.  Eregli, 308 F. Supp. 3d at 1306–07 (citing Sahaviriya Steel

Indus., 34 CIT at 727, 714 F. Supp. 2d at 1280).  A party proposing a date other than the invoice

date must show that the administrative record as a whole demonstrates that the material terms were

"finally" and "firmly" established on that date and that the agreement was not merely a preliminary

agreement in an industry where renegotiation is common.  See Preamble at 27348–49; see also

Yieh Phui Enterprise Co., 35 CIT at 1125–28, 791 F. Supp. 2d at 1323–26.

The provision in question appears in Section 10 of the contract which lists "special

provisions."  The provision states that "any revision and/or modification to the present contract

are [sic] valid only if made in writing and duly signed by both parties."  Kaptan's Sec. C Ex. C-

6.b at 202.  The Board Resolution states that "[N]o changes related to price and quantity (except

for changes within quantity tolerance) will be accepted under any circumstances."  Kaptan's Supp.

A-C Ex. S1-40 at 315.

Kaptan contends that the contract provision indicates that the parties could not change the

material terms of the contract.  Yet, Kaptan itself notes that historically, parties often made changes

to the material terms of the contract (specifically the price and quantity) after contracting, and this

was the very reason why Kaptan adopted the Board Resolution.  Oral Argument at 16:24.  Further,

Commerce notes, and Kaptan does not contest, that the Board Resolution did not result in

amendment to the terms of Kaptan's sales contracts.  This means that prior contracts had the same

provision, even in the period prior to the Board Resolution when renegotiation was common.[7]

---

[7] One such contract was provided in the record.  The contract is dated before the Board Resolution
and contained the exact same provision.  Kaptan's Response to the Department's Section C
Questionnaire Ex. C-6.b at 138, C.R. 48-70, P.R. 61 (Dec. 8, 2022) ("Kaptan's Sec. C").  This

IDM at 16; see Pl. Reply at 14–15.  Accordingly, the presence of this provision in the contract

alone would not lead the contracting parties to believe that the material terms were being "firmly"

and "finally" set.

This leaves the Board Resolution as the only evidence that the material terms were set on

the contract date.[8]  While Kaptan argues that the Board Resolution prohibits parties without Board

approval from modifying all material terms of the sale, the Board Resolution only speaks to price

and quantity.  Pl. Mot. at 28; Kaptan's Supp. A-C Ex. S1-40 at 315; Oral Argument at 1:18:44.

Kaptan itself notes that the Board Resolution was not prepared with all material terms in mind.

Oral Argument at 1:20:16.  In particular, the Resolution makes no mention of other material terms

such as size breakdowns, payment, and delivery dates.[9]  Given that the language of the contracts

---

[8] Kaptan also points to evidence of its sales practice for its U.S. exports along with the fact that the material terms of this contract did not change to support its argument that the material terms were established in the contract.  This argument is not convincing.  Kaptan describes its sales practice for its U.S. exports as requiring the contract terms to be particularly rigid given the long lead time of its U.S. orders along with fluctuations in the price of scrap metal.  Pl. Mot. at 22–24.  This dynamic led Kaptan's Board to adopt the Resolution.  Yet, the Resolution only speaks to price and quantity terms, not other material terms.  Kaptan's Response to the Department's Supplemental Sections A-C Questionnaire Ex. S1-40 at 315, C.R. 180-246, P.R. 89-90 (June 1, 2023) ("Kaptan's Supp. A-C")).  Given that renegotiation of contracts was common prior to the Board Resolution, Kaptan has not pointed to record evidence showing that the market dynamics necessarily show that parties may not renegotiate other material terms.  Further, that the material terms of this particular contract did not change between the contract and invoice date has little bearing on whether the material terms were set in the contract.  The proper analysis is a prospective rather than retrospective one to establish whether there was a meeting of the minds regarding the material terms on the contract date.  See Nucor Corp. v. United States, 33 CIT 207, 259–260, 612 F. Supp. 2d 1264, 1308 (2009).  That the material terms did not change after the contract date is not sufficient evidence to show that the contracting parties intended the material terms to be firmly and finally set at the time of contracting.

[9] Kaptan does not dispute that the size breakdown is a material term.  In its brief, Kaptan notes that Commerce alleges that not all the material terms were established in the contract because the size breakdown was not specified.  Rather than arguing that size breakdown is not a material term, Kaptan only disputes whether the size breakdown was provided in the contract.  Pl. Mot. at 30–31; Pl. Reply at 16–17.

[Above footnotes, preceding:] suggests that the "boilerplate" language of the contracts did not change after the Board adopted the Resolution.

has not been historically binding on contracting parties and that the Board Resolution does not bar changes to all material terms, this factor does not favor plaintiff.  Overall, the court concludes that substantial evidence on this record supports Commerce's use of the invoice date rather than the contract date as the date of sale.

### III.    Commerce's DIFMER adjustment methodology is supported by substantial evidence

Kaptan also argues that Commerce's differences-in-merchandise DIFMER calculation was distorted because of the way it accounted for inflation.  Pl. Mot. at 33.  Commerce contends that it conducted its DIFMER analysis using monthly indexes that control for inflation, meaning that its DIFMER analysis was not distorted by time-based variables.  Gov. Resp. at 33–34.  Commerce notes that it used monthly-indexed costs to calculate the cost of production to even out swings in the production costs over short periods of time experienced by Kaptan due to inflation.  Id. at 34–35.  It argues that this process therefore mitigated the impact of inflation on the analysis because Commerce could compare the export price of the CONNUM sold in the United States to the CONNUM sold in the home market on a month-to-month basis, making inflation a more stable variable in the comparison.  Id. at 36.

As discussed above, when Commerce calculates the dumping margin, it compares the export price of the subject merchandise (the price at which it is sold in the U.S.) to its normal value (the price at which it is sold in its home market).  See 19 U.S.C. § 1677b(a).  When the exact product is not sold in the home market, Commerce must use a CONNUM with similar physical characteristics sold in the home market to calculate the normal value.  See 19 C.F.R. § 351.411; 19 U.S.C. § 1677b(a)(6)(C)(ii).  This requires an adjustment to account for the costs related to the physical differences (DIFMER).

In a high inflation context, Commerce instructs respondents to report monthly rather than annual costs. <u>IDM</u> at 23. Commerce then restates every month's variable costs in the final period of review month's dollar value. <u>Id.</u>; Oral Argument at 45:20. Once these costs are restated, Commerce follows its normal practice of calculating the annual weighted average cost of production for each CONNUM across the period of review with production quantity as the weighting factor. <u>IDM</u> at 23; <u>see</u> Oral Argument at 45:42, 50:56. Commerce then deflates the adjusted weighted average cost of production back to the original dollar value of each month in the period of review. Oral Argument at 45:54; 52:31. Commerce then conducts a month-to-month comparison of those variable costs of the home market and exported goods to account for the cost related to the physical differences in the products. Oral Argument at 45:55, 52:38; <u>see</u> 19 C.F.R. § 351.411; 19 U.S.C. § 1677b(a)(6)(C)(ii). This adjustment in the calculation of normal value is the DIFMER adjustment and is the step of the process with which Kaptan takes issue. <u>See</u> Pl. Reply at 19.

Kaptan argues that before this monthly indexing, the DIFMER was negative, which would call for a decrease of the normal values of sales of the home-market CONNUMS. Pl. Mot. at 34. After such monthly indexing, the DIFMER turned positive, which means the normal values determined for sales of the home-market CONNUMS were increased. <u>Id.</u> at 34–35. Kaptan does not explain why such an impermissible distortion only occurs in the DIFMER adjustment and not the corresponding cost of production calculation beyond arguing that they are "different calculations that are used by Commerce in different ways." Pl. Reply at 19. As Commerce notes, an analysis that uses this methodology at one stage of the analysis but not the other would be inconsistent and would distort the analysis as it would control for inflation at one stage while virtually ignoring inflation at the other. <u>See</u> Gov. Resp. at 34–35.

Kaptan does not make clear that the impact of the monthly indexing for the DIFMER calculation is distortive. Kaptan notes only that the monthly indexing caused a large change in the DIFMER but does not point to any evidence that this change was a distortion. See Pl. Mot. at 34–35. If anything, it could be the case that an unindexed DIFMER calculation would be inaccurate and improperly allow inflation to influence the analysis, whereas Commerce's indexing method produces the proper result. Kaptan has not presented sufficient evidence for the court to conclude that Commerce's approach to the DIFMER analysis in inflationary contexts is unreasonable, particularly given that the monthly indexing process as conducted seems to the court to be a reasonable way to minimize the impact of inflation on the DIFMER analysis. The court therefore concludes that Commerce's DIFMER calculation methodology is supported by substantial evidence and is in accordance with law.

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's date of sale determination, its DIFMER analysis, and the resulting dumping rate in its Final Results and denies Plaintiff's Motion for Judgment on the Agency Record.

  /s/Jane A. Restani  
Jane A. Restani, Judge

Dated: January 15, 2025
       New York, New York